[Cite as *State v. Attia*, 2021-Ohio-2890.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

MAJED A. ATTIA,

        Defendant-Appellant.

CASE NO. 2021-L-003

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2019 CR 001073

**O P I N I O N**

Decided: August 23, 2021
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor; *Kristi L. Winner* and *Adam M. Downing*, Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Edward R. LaRue*, The Rockefeller Building, Suite 1300, 614 West Superior Avenue, Cleveland, OH 44113 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Majed A. Attia ("Mr. Attia"), appeals his convictions following a jury trial in the Lake County Court of Common Pleas in which he was found guilty of two counts of complicity to aggravated burglary and two counts of complicity to felonious assault.

{¶2} Mr. Attia asserts four assignments of error, contending that the trial court erred in failing to order judgments of acquittal on the four charged offenses pursuant to Crim.R. 29(A) due to the insufficiency of the evidence to sustain his convictions.

{¶3} After a careful review of the record and pertinent law, we find as follows:

{¶4} First, due to merger at sentencing, Mr. Attia was only "convicted" of counts 1 and 3. Therefore, we will not review the sufficiency of the evidence underlying counts 2 and 4.

{¶5} Second, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to aggravated burglary (count 1) beyond a reasonable doubt. A reasonable jury could infer Mr. Attia was aware that soliciting or procuring the principal offender to assault Robert Finucan ("Robbie") at the Finucan home would probably cause a certain result, i.e., the principal offender trespassing into the Finucan home.

{¶6} In addition, to establish aggravated burglary, the state was not required to prove that Robbie's father ("Mr. Finucan") was the intended victim of the underlying criminal offense or that Mr. Attia was aware that the principal offender would inflict, attempt to inflict, or threaten to inflict physical harm to Mr. Finucan. Rather, the state met its burden of production by establishing that Robbie was the intended victim and that both Mr. Finucan and Robbie suffered physical harm.

{¶7} Finally, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to felonious assault (count 3) beyond a reasonable doubt. The principal offender's testimony indicates that Mr. Attia expressly contemplated Mr. Finucan being assaulted. Therefore, a reasonable jury could infer from Mr. Attia's assurance to the principal offender that "if the father jumped in," Mr. Attia "was going to have [his] back," Mr. Attia was aware that soliciting or procuring the principal offender to assault Robbie at the

2

Finucan home would probably cause a certain result, i.e., Mr. Lewis feloniously assaulting Robbie and/or Mr. Finucan.

{¶8}  Thus, we affirm the judgment of the Lake County Court of Common Pleas.

## Substantive and Procedural History

{¶9}  On the evening of September 27, 2019, Mentor High School held its homecoming football game.  Spectators in attendance included Mr. Attia's younger brother, O.A.; his younger sister, Rana; and Robert Finucan ("Robbie"), who were all Mentor High School students.

### *Physical Altercation*

{¶10}  The football game had a Hawaiian theme, and spectators in the student section wore beach clothing and were throwing around beach balls.  At one point, Robbie and Rana both reached for the same beach ball, which resulted in some type of physical contact.

{¶11}  O.A. was subsequently informed that Robbie had shoved his sister. According to O.A., Robbie had also made fun of Rana the week prior.  O.A. angrily confronted Robbie at his seat.  When Robbie attempted to leave the area, O.A. followed him around the stadium.  O.A. also contacted Robbie multiple times via Snapchat wanting to fight.  They eventually agreed to meet at Veteran's Park in Mentor to fight, although Robbie later stated that he did not plan to show up.

{¶12}  Meanwhile, Mr. Attia was at his parents' house in Kirtland Hills with his close friends Elijah McDougall ("Mr. McDougall"), Isaiah Gullick ("Mr. Gullick"), Camryn Jennings ("Ms. Jennings"), and Sarah Keen ("Ms. Keen").  Mr. Attia and his friends had graduated from high school a couple of years prior.  O.A. called Mr. Attia and told him

3

Case No. 2021-L-003

what had happened between Robbie and their sister at the game. Mr. Attia and his four friends got into his Jeep, and Mr. Attia drove everyone to the game.

{¶13} Hailey Bernot ("Ms. Bernot") was a friend of Robbie and was watching the game. She witnessed O.A.'s encounter with Robbie and followed O.A. to Mr. Attia's Jeep. As O.A. entered the Jeep, she leaned into the window and told Mr. Attia, "Please don't hurt my friend." Mr. Attia replied, "I can't promise that."

{¶14} After picking up O.A., Mr. Attia used O.A.'s phone to call Robbie. He requested to speak to Robbie's father, but Robbie responded with expletives and hung up. Mr. Attia drove to the Finucan home in Mentor and pulled into the driveway. He and Mr. McDougall got out and went to the front door, but no one was home.

### Dewaune Lewis

{¶15} Mr. Attia and O.A. remained upset about what had happened to their sister at the football game. Mr. Attia called Dewaune Lewis ("Mr. Lewis") and drove everyone to pick him up at his house in Euclid.

{¶16} According to Mr. Attia, he had purchased marijuana from Mr. Lewis a few days prior. During that visit, Mr. Lewis mentioned that he was always at home babysitting and wanted to get to know Mr. Attia and his friends better. Mr. Attia mentioned that he was having a party on Friday and agreed to pick up Mr. Lewis.

{¶17} According to Mr. Lewis, however, Mr. Attia called that night because he wanted Mr. Lewis "to handle something" for him. Specifically, Mr. Attia offered to pay Mr. Lewis to fight for him. Mr. Lewis had never previously "hung out" with Mr. Attia but had seen him at the house of his older cousin, Billy Harper ("Mr. Harper"), who lived in

4

Cleveland.  According to Mr. Harper, he had previously told Mr. Attia that Mr. Lewis would help him fight.

### The Party

{¶18}  After picking up Mr. Lewis, Mr. Attia drove everyone back to his house, where they congregated in his apartment-style bedroom.  Additional friends arrived, including Miranda Briggs ("Ms. Briggs"), Kailey Sikora ("Ms. Sikora"), Jason Grove ("Mr. Grove"), and Mr. Grove's girlfriend, Alana Chester ("Ms. Chester").  Alexis Dion ("Ms. Dion"), who was Mr. McDougall's girlfriend, arrived later upon his request.

{¶19}  Mr. Lewis, Mr. Attia, and the other attendees drank alcohol and smoked marijuana.  Mr. Attia introduced Mr. Lewis to some of the attendees as "Billy's cousin." Most of the attendees had never met Mr. Lewis before, and many later testified that his presence and demeanor seemed unusual.

{¶20}  Many attendees also later testified that Mr. Attia was upset during the party about the situation between Robbie and his sister.  According to Ms. Dion, Mr. Attia spoke about getting "revenge" on behalf of his family.  According to Ms. Chester, she encountered Mr. Attia, Mr. Lewis, and Mr. McDougall out on the balcony having a conversation that they did not want anyone else to hear.

{¶21}  According to Mr. Lewis, Mr. Attia said that Robbie had beat his sister and that he wanted Mr. Lewis to "f**k Robbie up."  To Mr. Lewis, this meant that he was supposed to beat Robbie up the best way he could.  Mr. Attia did not want to fight Robbie himself because Robbie knew him.  Mr. Lewis was not from the area, and no one knew anything about him.

5

{¶22} Mr. Lewis and Mr. Attia planned to leave the party "to go f\*\*k Robbie up." Mr. Attia never said anything to Mr. Lewis about wanting to talk to Robbie or Robbie's father. Rather, Mr. Attia wanted Mr. Lewis to fight Robbie and told him that "if the father jumped in," Mr. Attia "was going to have [his] back."

{¶23} Mr. Gullick left the party at about 9 p.m. to meet his girlfriend at their apartment. Mr. McDougall and Ms. Dion also left the party to get food.

### The Offenses

{¶24} Eventually, four people remained at the party – Mr. Attia, Mr. Lewis, Ms. Keen, and Ms. Jennings. At about 10:30 p.m., Ms. Keen and Ms. Jennings were preparing to leave. Mr. Attia asked Ms. Keen to drive him to the Finucan home. Ms. Keen responded that she did not want to drive him somewhere to fight. Mr. Attia stated that they were just going to talk to Robbie's father. All four got into Ms. Keen's car, and Mr. Attia gave Ms. Keen directions to the Finucan house.

{¶25} When they arrived, Ms. Keen pulled into the driveway but then parked on the street in front of the house. Mr. Lewis got out of the car, while everyone else, including Mr. Attia, stayed inside watching and waiting. Mr. Lewis walked to the front door and knocked. Joseph Finucan ("Mr. Finucan"), Robbie's father, opened the door slightly. Mr. Lewis asked where Robbie was, and Mr. Finucan responded that Robbie was not home. Mr. Finucan turned to his wife and told her to call the police, hoping this would scare off Mr. Lewis. As Mr. Finucan turned his head, Mr. Lewis punched him hard on the left side of his jaw. Mr. Finucan flew backwards into a wall and onto the floor. Mr. Lewis entered the house and headed up the stairs. Mrs. Finucan ran into the bathroom and called 911.

6

{¶26} Mr. Finucan's tooth had perforated his cheek, which caused him to bleed profusely from his mouth. He got up and went into his garage, where he grabbed a metal baseball bat. Mr. Lewis and Robbie came running down the stairs, at which time Mr. Finucan hit Mr. Lewis with the baseball bat. Mr. Finucan and Mr. Lewis wrestled on the ground while Robbie went to the garage and got a baseball bat. Mr. Lewis managed to scramble out the front door.

{¶27} Mr. Lewis returned to the backseat of Ms. Keen's car. He was bleeding heavily from a gash in his forehead. According to Mr. Lewis, he told Mr. Attia that he "beat Robbie up."

{¶28} Ms. Keen drove to Euclid to drop off Mr. Lewis at his house. When they arrived, Mr. Attia and Mr. Lewis got out of the car and spoke to Mr. Lewis's cousin, Mr. Harper. Mr. Attia came back to the car and asked Ms. Keen and Ms. Jennings if they had any cash on them, which they did not. According to Mr. Attia, he intended to purchase marijuana from Mr. Harper but realized he did not have any cash on him. According to Mr. Lewis, however, Mr. Attia paid him $5 that night.

{¶29} After dropping off Mr. Lewis, the three friends went to a BP gas station in Mentor. Mr. Attia purchased a Gatorade using his father's credit card, and Ms. Keen attempted to clean Mr. Lewis's blood from her car.

{¶30} At Mr. Attia's request, Ms. Keen dropped him off at Newell Creek, which is a housing development located near Mr. Attia's house. Mr. Attia called Mr. McDougall indicating that he was in trouble and needed to be picked up. Mr. McDougall and Ms. Dion picked up Mr. Attia at Newell Creek and dropped him off at his house.

7

{¶31} Mr. Attia later called both Ms. Chester and Ms. Sikora via FaceTime and told them not to talk about the football game.

{¶32} According to Mr. Lewis, Mr. Attia came back the next day and paid him $100. Mr. Attia stated that the police were questioning him, so he had to delete Mr. Lewis's phone number.

### Police Investigation

{¶33} Officers from the Mentor Police Department responded to Mrs. Finucan's 911 call. Mr. Finucan was taken to the hospital by ambulance, where he stayed overnight. He received a CT scan which revealed blood on his brain. He also sustained bruises all over his body. Robbie received a few scratches to his face but did not go to the hospital.

{¶34} Mr. Harper's girlfriend took Mr. Lewis to the hospital, where he received stiches to his forehead.

{¶35} After speaking to the Finucans, the police went to the Attia home to talk to O.A., who was not home. The police spoke with Mr. Attia, who called O.A. but did not mention his involvement in the matter.

{¶36} The police subsequently identified and interviewed the party attendees, Mr. Lewis, and Mr. Harper.

{¶37} Mr. Gullick and Mr. McDougall both made statements to police indicating that they were aware the situation could get out of hand and that they left the party to avoid involvement. At trial, however, Mr. McDougall contended that he had told the police "what they wanted to hear."

{¶38} Shortly after commencing the investigation, the police arrested both Mr. Lewis and Mr. Attia.

8

### *Indictment*

{¶39} In May 2020, the Lake County Grand Jury indicted Mr. Attia on the following four counts: complicity to aggravated burglary in violation of R.C. 2923.03(A)(1), a felony of the first degree, by knowingly soliciting or procuring Mr. Lewis to commit aggravated burglary in violation of R.C. 2911.11(A)(1) (count 1); complicity to aggravated burglary in violation of R.C. 2923.03(A)(2), a felony of the first degree, by knowingly aiding or abetting Mr. Lewis in committing aggravated burglary in violation of R.C. 2911.11(A)(1) (count 2); complicity to felonious assault in violation of R.C. 2923.03(A)(1), a felony of the second degree, by knowingly soliciting or procuring Mr. Lewis to commit felonious assault in violation of R.C. 2903.11(A)(1) (count 3); and complicity to felonious assault in violation of R.C. 2923.03(A)(2), a felony of the second degree, by knowingly aiding or abetting Mr. Lewis in committing felonious assault in violation of R.C. 2903.11(A)(1) (count 4).

{¶40} Mr. Attia waived his right to arraignment and entered not guilty pleas to the charged offenses.

### *Jury Trial*

{¶41} The matter was tried to a jury over three days. The state presented testimony from several witnesses, including Ms. Bernot, Mr. and Mrs. Finucan, Robbie, Ms. Keen, Ms. Jennings, Ms. Briggs, Ms. Sikora, Mr. Grove, Ms. Chester, Ms. Dion, the investigating police officers, Mr. Lewis, and Mr. Harper.

{¶42} During his testimony, Mr. Lewis indicated that he had entered into a cooperation agreement with the state in which he agreed to plead guilty to burglary and attempted felonious assault and to testify truthfully upon the state's request. In return, the state agreed to recommend a prison sentence of no more than seven years.

{¶43} The state also obtained testimony from Mr. McDougall and Mr. Gullick as the court's witnesses, and presented numerous exhibits, including photographs, video recordings, and cell phone records.

{¶44} Following the state's case-in-chief, the defense moved for judgment of acquittal pursuant to Crim.R. 29(A), which the trial court denied.

{¶45} The defense presented testimony from O.A. and Mr. Attia. Upon resting, the defense renewed its motion for a judgment of acquittal pursuant to Crim.R. 29(A), which the trial court again denied.

{¶46} Following deliberation, the jury returned guilty verdicts on all four counts. The trial court ordered a presentence investigation, a drug and alcohol evaluation, and victim impact statements and scheduled the matter for sentencing.

### *Sentencing*

{¶47} At the sentencing hearing, the trial court determined that counts 1 and 2 and counts 3 and 4 merged for purposes of sentencing. The state elected to proceed with sentencing on counts 1 and 3.

{¶48} The trial court sentenced Mr. Attia to prison terms of eight to 12 years on count 1 and three years on count 3 to run concurrently, resulting in a total prison term of eight to 12 years. The trial court subsequently issued a judgment entry memorializing the jury's guilty verdicts and Mr. Attia's sentences.

{¶49} Mr. Attia appealed and presents the following four assignments of error for our review:

{¶50} "[1.] The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 1 due to the insufficiency of the

10

evidence of each and every element of the crime of complicity to aggravated burglary by solicitation or procurement of Dewaune Lewis to commit aggravated burglary.

{¶51} "[2.] The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 2 due to the insufficiency of the evidence of each and every element of the crime of complicity to aggravated burglary by aiding or abetting Dewaune Lewis to commit aggravated burglary.

{¶52} "[3.] The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 3 due to the insufficiency of the evidence of each and every element of the crime of complicity to felonious assault against Joseph Finucan by solicitation or procurement of Dewaune Lewis to commit felonious assault against Joseph Finucan.

{¶53} "[4.] The trial court erred in failing to order a judgment of acquittal pursuant to Ohio Rule of Criminal Procedure 29(A) on Count 4 due to the insufficiency of the evidence of each and every element of the crime of complicity to felonious assault against Joseph Finucan, by aiding or abetting Dewaune Lewis to commit felonious assault against Joseph Finucan."

### Effect of Merger

{¶54} Mr. Attia challenges his "convictions" on all four of the charged offenses. According to the Supreme Court of Ohio, a "conviction" consists of a guilty verdict and the imposition of a sentence or penalty. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 12; *State v. Macko*, 11th Dist. Lake No. 2016-L-022, 2017-Ohio-253, ¶ 27.

11

{¶55} As indicated, the trial court merged count 2 into count 1 and count 4 into count 3 and imposed sentences on counts 1 and 3. Since Mr. Attia was only "convicted" of counts 1 and 3, we will not review the sufficiency of the evidence underlying counts 2 and 4.

{¶56} For this reason, Mr. Attia's second and fourth assignments of error are without merit.

**Standard of Review**

{¶57} We address Mr. Attia's first and third assignments of error together, where he contends that the trial court erred by denying his Crim.R. 29 motion for acquittal because the state failed to produce sufficient evidence to sustain his convictions, respectively, on count 1 (complicity to aggravated burglary by soliciting or procuring) and on count 3 (complicity to felonious assault by soliciting or procuring).

{¶58} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, when a defendant makes a Crim.R. 29 motion, he or she is challenging the sufficiency of the evidence introduced by the state. *State v. Patrick*, 11th Dist. Trumbull Nos. 2003-T-0166 & 2003-T-0167, 2004-Ohio-6688, ¶ 18.

{¶59} ""[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio

St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶60} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶61} When evaluating the adequacy of the evidence, we do not consider its credibility or effect in inducing belief. *Thompkins* at 387. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law. *Id*. at 386. In addition, circumstantial evidence and direct evidence inherently possess the same probative value, even when used to prove essential elements of an offense. *See Jenks* at 272.

**Complicity to Aggravated Burglary**

{¶62} Mr. Attia was convicted in count 1 of complicity in violation of R.C. 2923.03(A)(1) by knowingly soliciting or procuring Mr. Lewis to commit aggravated burglary in violation of R.C. 2911.11(A)(1).

{¶63} R.C. 2923.03 defines complicity. It provides, in relevant part, that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * *[s]olicit* or *procure* another to commit the offense." (Emphasis added.) R.C.

13

2923.03(A)(1). A defendant who commits complicity in the commission of an offense "is prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶64} The statute does not define the terms "solicit" or "procure." The trial court used the definitions set forth in the Ohio Jury Instructions, which define "solicit" as "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear" and "procure" as "to get, obtain, induce, bring about, motivate." *Ohio Jury Instructions*, CR Section 523.03(A) (Rev. February 6, 2016). This court has adopted these definitions. *See In re S.J.F.*, 11th Dist. Geauga No. 2010-G-2960, 2010-Ohio-5514, ¶ 18.

{¶65} R.C. 2911.11 defines aggravated burglary. It provides, in relevant part, that "[1] [n]o person, by force, stealth, or deception, [2] shall trespass in an occupied structure * * *, [3] when another person other than an accomplice of the offender is present, [4] with purpose to commit in the structure * * * any criminal offense, [5] if any of the following apply: * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another * * *." R.C. 2911.11(A)(1).

### Trespass

{¶66} Mr. Attia first contends that the state failed to produce "any evidence" that he knowingly solicited or procured Mr. Lewis to trespass into the Finucan home.

{¶67} A person trespasses when he or she "[*k]nowingly* enter[s] * * * the land or premises of another * * * without privilege to do so." (Emphasis added.) R.C. 2911.21(A)(1). *See* R.C. 2911.10 (defining trespass, for purposes of the burglary statute, as a violation of R.C. 2911.21).

{¶68} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a

14

certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B).

{¶69} This court has previously stated that the legal concept of "knowingly" incorporates the scienter requirement that one ought to know one's actions will "probably cause certain results." *State v. Magnusson*, 11th Dist. Lake No. 2006-L-263, 2007-Ohio-6010, ¶ 51.

{¶70} Because a defendant's mental state is difficult to demonstrate with direct proof, it may be inferred from the circumstances surrounding the offense. *State v. Worthy*, 11th Dist. Lake No. 2004-L-137, 2005-Ohio-5871, ¶ 24; *State v. Johnson*, 93 Ohio St.3d 240, 245, 754 N.E.2d 796 (2001). In the context of complicity, the relevant circumstances include the defendant's conduct "'before and after the offense is committed.'" *Johnson* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶71} In support of his argument, Mr. Attia relies on Mr. Lewis's volunteered statement during cross-examination, in which he stated, "That was my fault that I went in house [sic]." According to Mr. Attia, this testimony "conclusively proves" that he never "sought, asked, influenced, invited, or pressured" Mr. Lewis "to enter the Finucan home at all."

{¶72} Mr. Attia quotes Mr. Lewis's statement out of context. The remainder of the referenced exchange was as follows:

{¶73} "Q. That was your fault.

15

{¶74} "A.  Yes.

{¶75} "Q.  That was not [Mr. Attia's] fault, was it?

{¶76} "A.  Well, [Mr. Attia] took me to the house.

{¶77} "Q.  But he didn't tell you to go in the house?

{¶78} "A.  No, he did not tell me to go in the house but he took me to the house.

{¶79} "Q.  He took you to the house.

{¶80} "A.  [Mr. Attia] knew what he was doing.

{¶81} "Q.  Okay.

{¶82} "A.  You knew them people knew him and knew his brother.

{¶83} "Q.  Okay.

{¶84} "A.  Come on now, I might not be from down here but you don't got to try to play me like I'm slow."

{¶85} Mr. Attia's argument also does not acknowledge the following testimony during Mr. Lewis's direct examination:

{¶86} "Q.  What did [Mr. Attia] tell you he wanted you to do to Robbie?

{¶87} "A.  He wanted me to f**k Robbie up.

{¶88} "* * *

{¶89} "Q. [Mr. Attia] told you he wanted you to f**k Robbie up?

{¶90} "A. Yeah, when somebody's that mad what else do you expect they take you to somebody's house, they show you the house.

{¶91} "Q.  Okay. What does f**k somebody up mean to you?

{¶92} "A.  Beat them up the best way you can.

{¶93} "Q.  What do you mean the best way you can?

16

{¶94} "A. Just that's the way I took it. Especially with him being mad, that's the only thing on his mind, yeah, that's the way I took it. That's how he wanted it cause if he didn't he would have never took me to the house and pointed out the house."

{¶95} Thus, contrary to Mr. Attia's assertion, Mr. Lewis did not testify that entering the Finucan home was his own idea. Rather, he believed Mr. Attia wanted him to do so.

{¶96} Mr. Lewis's apparent acceptance of responsibility for some of his actions does not negate Mr. Attia's complicity. In fact, a complicity offense requires that the principal offender has "actually committed" the underlying offense. *See* R.C. 2923.03(C) ("No person shall be convicted of complicity under this section unless an offense is actually committed * * *").

{¶97} Further, the definitions of "solicit" and "procure" encompass more than an express request that the principal offender perform a specific act. *See Johnson, supra*, at 245 ("The fact that defendant did not articulate his intent will not allow him to escape responsibility for his clear actions of complicity * * *").

{¶98} Mr. Attia also relies on the Ninth District Court of Appeals' decision in *State v. Rohr-George*, 9th Dist. Summit No. 23019, 2007-Ohio-1264. In that case, the defendant was convicted of complicity after her current lover murdered her former lover. *Id.* at ¶ 1. On appeal, the Ninth District held that the state failed to present sufficient evidence that the defendant solicited or procured the principal offender to commit the murder. *Id.*

{¶99} The court acknowledged that the state was not required to present evidence of a "specific statement to solicit the murder." *Id.* at ¶ 28. However, the state was required to present evidence "from which a reasonable fact finder could infer that the defendant,

17

acting with the specific purpose to cause a murder, did something to seek, ask, influence, invite, tempt, lead on, pressure, get, obtain, induce, bring about, or motivate the principal to commit the murder." *Id.* The court found that the record before it contained "*no such evidence* to evaluate." (Emphasis added.) *Id.* Specifically, the state presented "*no evidence of anything that [the defendant] said or did* from which a reasonable fact finder could have concluded that [she], acting with the specific intent to cause [the victim's death], solicited or procured [the principal offender] to murder him." (Emphasis added.) *Id.*

{¶100} We do not find *Rohr-George* to be instructive. Unlike that case, the state presented numerous witnesses and documentary evidence establishing Mr. Attia's conduct before, during, and after the offenses. In fact, Mr. Attia concedes that the state presented sufficient evidence to establish that he asked Mr. Lewis to "beat up Robbie."

{¶101} The state cites in support of its argument the Ninth District's decision in *State v. Sprenz*, 9th Dist. Summit No. 18254, 1998 WL 78675 (Feb. 11, 1998). In that case, the defendant agreed to pay the principal offender $500 to "scare" the victim and gave him the victim's address. *Id.* at *1. The principal offender subsequently appeared on the victim's porch and asked if she was there. *Id.* After being informed that she was not, the principal offender broke the front door window, entered the house, assaulted the victim with a stun gun, and set the house on fire. *Id.* The defendant subsequently paid the principal offender $300 and congratulated him on a "good job." *Id.*

{¶102} The defendant was subsequently convicted of complicity to commit aggravated burglary, among other offenses. *Id.* at *2. On appeal, the defendant contended that there was no evidence that he did anything more than ask someone to

18

"scare" the victim. *Id.* at *3. Therefore, there was no evidence that he asked anyone to break into the victim's house. *Id.* The Ninth District disagreed and found that the jury could reasonably infer that the defendant intended for the principal offender to scare the victim at her home and that the "scare" the defendant sought included trespassing into the victim's dwelling for the purpose of feloniously assaulting her. *Id.*

{¶103} We agree with the state that *Sprenz* is factually similar to the present case. Further, the evidence regarding Mr. Attia's conduct permits an even stronger inference than in *Sprenz*.

{¶104} Mr. Lewis testified that Mr. Attia picked him up "to handle something." Specifically, Mr. Attia offered to pay him to "f**k Robbie up." After they "got drunk" at the party, Mr. Attia told Mr. Lewis that the plan was "to go f**k Robbie up" because Robbie had beat Mr. Attia's sister. Ms. Keen testified that Mr. Attia asked her to drive him and Mr. Lewis to the Finucan home, which she did. There is no dispute that, upon their arrival, Mr. Lewis trespassed into the Finucan home by force. There is no evidence that Mr. Attia attempted to stop Mr. Lewis from doing so.

{¶105} Following the offenses, Ms. Keen drove Mr. Lewis back to his house in Euclid despite the fact that he was "covered in blood" and bleeding from a "huge gash" in his forehead. Ms. Keen and Ms. Jennings both testified that after arriving at Mr. Lewis's house, Mr. Attia asked them if they had any cash. Mr. Lewis testified that Mr. Attia paid him $5 that night.

{¶106} There is also no dispute that Mr. Attia asked Ms. Keen to drop him off at a housing development in Newell Creek rather than at his house. Mr. Attia called Mr. McDougall, who arrived in his car with Ms. Dion and drove Mr. Attia home.

19

Case No. 2021-L-003

{¶107} After the police responded to Mrs. Finucan's 911 call, they went to the Attia home and spoke to Mr. Attia, who failed to disclose his involvement in the matter. Ms. Chester and Ms. Sikora both testified that Mr. Attia called them via FaceTime and told them not to talk about the football game.

{¶108} Finally, Mr. Lewis testified that Mr. Attia came back the next day and paid him $100, at which time Mr. Attia stated that he had to delete Mr. Lewis's number because the police were questioning him.

{¶109} Given the foregoing evidence, we conclude a reasonable jury could infer Mr. Attia was aware that soliciting or procuring Mr. Lewis to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis trespassing into the Finucan home.

### *Physical Harm to Mr. Finucan*

{¶110} Mr. Attia next contends that the state failed to produce "any evidence" that he knowingly solicited or procured Mr. Lewis for the purpose of committing assault, felonious assault, or aggravated menacing against Mr. Finucan or that he was aware it was likely that Mr. Lewis would inflict, attempt to inflict, or threaten to inflict harm to Mr. Finucan.

{¶111} Mr. Attia's argument misconstrues the state's burden of production.

{¶112} The fourth element of aggravated burglary requires a "*purpose* to commit in the structure * * * any criminal offense." R.C. 2911.11(A). "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends

20

to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature."  R.C. 2901.22(A).

{¶113} The trial court instructed the jury that the underlying "criminal offense" was "assault," "felonious assault," *and/or* "aggravated menacing."  The trial court defined "assault" as causing or attempting to cause physical harm to Mr. Finucan *and/or* Robbie and "aggravated menacing" as causing or threatening to cause serious physical harm to Mr. Finucan *and/or* Robbie.  Thus, to establish aggravated burglary, the state was not required to prove that *Mr. Finucan* was the intended victim of the underlying criminal offense.

{¶114} The fifth element is the aggravating element.  It requires the infliction, attempted infliction, or threatened infliction of "physical harm on another."  R.C. 2911.11(A)(1).  "Physical harm to persons" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration."  R.C. 2901.01(A)(3).

{¶115} The statute contains no mental state for this element.  The Supreme Court of Ohio has held that in such circumstances, no culpable mental state must be proven. *State v. Johnson*, 128 Ohio St.3d 107, 2010-Ohio-6301, 942 N.E.2d 347, ¶ 38 ("[I]f the General Assembly intends for the additional elements to carry their own mens rea, it must say so.  Otherwise, no culpable mental state need be proved for those elements").

{¶116} The trial court's instructions also did not require a mental state for the principal offender's infliction, attempted infliction, or threatened infliction of physical harm.  The instructions also did not specify a victim.  Thus, to establish aggravated burglary, the state was not required to prove that Mr. Attia was aware it was likely that Mr. Lewis would inflict, attempt to inflict, or threaten to inflict physical harm to *Mr. Finucan*.

21

{¶117} As indicated, Mr. Attia concedes that the state presented sufficient evidence to establish that he asked Mr. Lewis to "beat up Robbie," which satisfies the foregoing definitions of "assault" and/or "aggravated menacing." In addition, there is no dispute that both Mr. Finucan and Robbie suffered at least "physical harm." Therefore, the state met its burden of production with respect to the fourth and fifth elements of aggravated burglary.

{¶118} Accordingly, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to aggravated burglary beyond a reasonable doubt.

{¶119} Mr. Attia's first assignment of error is without merit.

## Complicity to Felonious Assault

{¶120} Mr. Attia was convicted in count 3 of complicity in violation of R.C. 2923.03(A)(1) by knowingly soliciting or procuring Mr. Lewis to commit felonious assault against Mr. Finucan in violation of R.C. 2903.11(A)(1).

{¶121} R.C. 2903.11(A)(1) provides, in relevant part, that "[n]o person shall *knowingly* * * * [c]ause serious physical harm to another * * *." (Emphasis added.)

{¶122} The applicable definitions of "solicit," "procure," and "knowingly" are set forth above.

### *Solicit or Procure*

{¶123} Mr. Attia first contends that Mr. Lewis's following testimony during cross-examination "proves" that he did not ask Mr. Lewis to feloniously assault Mr. Finucan:

{¶124} "Q. What happened next or why did you, why did you punch the father?

{¶125} "A. I was drunk.

22

Case No. 2021-L-003

{¶126} "Q. You were drunk?

{¶127} "A. Yes, I wasn't thinking right in my mind. I wasn't thinking right.

{¶128} "* * *

{¶129} "Q. You're the one that punched the dad in the face?

{¶130} "A. Yes.

{¶131} "Q. And you're the one that ran upstairs to get Robbie?

{¶132} "A. Yes, yes.

{¶133} "Q. Okay. And that was all you?

{¶134} "A. Yes, okay."

{¶135} Once again, Mr. Attia quotes Mr. Lewis's testimony out of context. The remainder of the first referenced exchange was as follows:

{¶136} "Q. [Mr. Attia] never told you to punch the father, did he?

{¶137} "A. He also didn't tell me not to go up to the house.

{¶138} "Q. Okay. But he never told you to punch the father?

{¶139} "A. He also didn't tell me not to go up to the house."

{¶140} Contrary to Mr. Attia's assertion, this testimony does not establish that Mr. Lewis *only* feloniously assaulted Mr. Finucan because he was drunk or that feloniously assaulting Mr. Finucan was not part of the plan. As indicated, Mr. Lewis's admission of criminal liability does not negate Mr. Attia's complicity, and the definitions of "solicit" and "procure" encompass more than an express request.

### *Knowingly*

{¶141} Mr. Attia next contends that even if he asked Mr. Lewis to "beat up" Robbie, the state produced "no evidence" that Mr. Lewis's felonious assault of Mr. Finucan was

Case No. 2021-L-003

"probably (more likely than not) to occur." He argues that inferring knowledge would be "incompatible with logic and common sense."

{¶142} Mr. Attia's argument does not acknowledge Mr. Lewis's following testimony:

{¶143} "Q. So did [Mr. Attia] talk to you about what the plan was?

{¶144} "A. Yeah, to go f**k Robbie up.

{¶145} "Q. So you left the party?

{¶146} "A. Yeah, we all did.

{¶147} "* * *

{¶148} "Q. Did [Mr. Attia] ever tell you he wanted you to go talk to --

{¶149} "A. No.

{¶150} "Q. -- Robbie?

{¶151} "A. He didn't say nothing about talking.

{¶152} "Q. Did he say he wanted to talk to Robbie's dad?

{¶153} "A. No, he didn't say nothing about talking.

{¶154} "Q. What did he say to you?

{¶155} "A. He wanted me to fight Robbie and he says if the father jumped in he was going to have my back.

{¶156} "Q. If who jumped in?

{¶157} "A. Robbie's father.

{¶158} "Q. Okay. So [Mr. Attia] told you if Robbie's father jumped in he would have your back?

{¶159} "A. Yeah."

24

Case No. 2021-L-003

{¶160} The foregoing testimony indicates that Mr. Attia expressly contemplated Mr. Finucan being assaulted. Therefore, a reasonable jury could infer from Mr. Attia's assurance to Mr. Lewis that "if the father jumped in," Mr. Attia "was going to have [his] back" that Mr. Attia was aware that soliciting or procuring Mr. Lewis to assault Robbie at the Finucan home would probably cause a certain result, i.e., Mr. Lewis feloniously assaulting Robbie and/or Mr. Finucan.

{¶161} Accordingly, construing the evidence in a light most favorable to the state, the state produced sufficient evidence, if believed, to establish the elements of complicity to felonious assault beyond a reasonable doubt.

{¶162} Mr. Attia's third assignment of error is without merit.

{¶163} For the foregoing reasons, the judgment of the Lake County Court of Common Pleas is affirmed.

CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.

Case No. 2021-L-003