[Cite as *State v. Diaz*, 2025-Ohio-2924.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-L-077 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| JULIO C. DIAZ, | |
| Defendant-Appellant. | Trial Court No. 2024 CR 000356 |

## OPINION AND JUDGMENT ENTRY

Decided: August 18, 2025
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Mary Catherine Corrigan*, 6555A Wilson Mills Boulevard, Suite 102, Mayfield Village, OH 44143 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Appellant, Julio C. Diaz, appeals the judgment of the Lake County Court of Common Pleas that sentenced him to an indefinite prison term of a minimum of five years up to a maximum of seven and one-half years after a jury found him guilty of Complicity to Burglary, Complicity to Breaking and Entering, and Complicity to Theft. He challenges the sufficiency and the manifest weight of the evidence as it relates to the count of Complicity to Burglary. For the following reasons, we affirm.

{¶2} In April 2024, a Lake County Grand Jury indicted Diaz on three counts: Complicity to Burglary, a second-degree felony, in violation of R.C. 2923.03(A)(1) and

2911.12(A)(2); Complicity to Breaking and Entering, a fifth-degree felony, in violation of R.C. 2923.03(A)(1) and 2911.13(B); and Complicity to Theft, a fifth-degree felony, in violation of R.C. 2923.03(A)(1) and 2913.02(A)(1).

{¶3} A four-day jury trial was held during which the State presented multiple witnesses and evidence on the incident, the surrounding circumstances, and the ensuing investigation.

{¶4} At around 4:30 p.m. on June 21, 2023, Rebecca Medvecky and Michael Frimel were at their home and noticed two individuals in neon green work vests walking by and entering the property across the street, which is located on Taft Street in Mentor, Ohio. One of the men was carrying a black crate, and they were conversing. Medvecky testified that it "didn't appear as if they knew what they were going to be doing." The men proceeded to the back of the house where they were out of view.

{¶5} Since they appeared suspicious, Medvecky and Frimel texted the owners of the property, Anthony Longhitano, III ("Longhitano") and his wife Charlotte, and called the police. While the men were in the back of the house, Medvecky and Frimel noticed a little red car in the driveway. After a short time, the two men ran from the back of the house—one carrying a garbage bag and the other, the black crate—and got into the passenger side and the back seat of the car waiting in the driveway. The driver, possibly a female, was not identified. Frimel, who was outside, photographed the men and the car in the Longhitanos' driveway. Medvecky had also taken several photographs from inside her and Frimel's home.

{¶6} Officers from the City of Mentor Police Department were dispatched to the scene. In the back of the home they found a broken window, a marijuana cannister on

Case No. 2024-L-077

the windowsill, and a crowbar on the ground. The Longhitanos' son, Anthony, arrived and ran into the house, indicating to the officers he was afraid for his dog's safety. When they entered the home, the officers noticed a strong odor of marijuana. They found a large amount of drug indicators in the home, such as marijuana, marijuana packaging, residue, scales, a money counter, mason jars, and a vacuum sealer. They contacted a narcotics detective, Detective Ryan Butler, and a separate investigation was started for the drugs found in the home. Longhitano arrived shortly after, identifying himself as the homeowner. He gave the police a list of missing items that included jewelry and several handguns. Longhitano, a former police officer, called a friend to investigate the license plate of the red car. His friend identified the vehicle—a red Saturn Ion—the owner, and the owner's address in Cleveland, Ohio. Longhitano relayed the information to the police.

{¶7} Earlier in the day, the red Saturn had been observed by the City of Mentor Chief of Police in Garfield Park in Mentor. He remembered the vehicle because it had looked suspicious, and he had followed it from the park until it drove into the city of Willoughby. After the burglary, the car was located in Cleveland, and the driver, Kenard Toeran, who was wearing a fluorescent yellow work vest, was arrested. Kenard's mother, Kimona Thomas, called the police department and informed them that Kenard was not the person who committed the crime. She identified the person who committed the burglary as Tyrone Thomas ("Thomas") and revealed there was evidence of the crime at her house in Cleveland. At her home, officers found a grey Nike shoebox that had approximately 50 THC oil cartridges, gel pens for the cartridges, other marijuana products, and a brown rocky substance that was later identified as a synthetic cannabinoid. Kimona, Kenard, and Thomas lived together and shared the red Saturn. A

Case No. 2024-L-077

search of the vehicle revealed a garbage bag and empty mason jars, similar to those the officers found in the Longhitanos' home.

{¶8}   During the course of their investigation, the officers discovered that the crowbar found in the Longhitanos' home, which had a UPC code on it, had been purchased by Diaz at the Home Depot in Euclid on the day of the burglary. Diaz had borrowed his girlfriend's white Buick Encore, and he was caught on surveillance cameras driving the vehicle and in the store. Diaz is a rapper who recorded a music video with Anthony, who ran a music/video studio. The video was posted on one of Anthony's Instagram accounts. Diaz and Anthony also followed each other's Instagram accounts.

{¶9}   Photographs from Flock, a security system that provides the police with license plate recognition photos and surveillance, identified the white Buick Encore in the Mentor/Willoughby area several days preceding the burglary and on the day of the burglary. On the day of the burglary, the Flock cameras captured the red Saturn following the white Buick from Garfield Park. With the Buick leading, the vehicles traveled to Anthony's studio in Willoughby and then proceeded to Mentor in the direction of the Longhitanos' house. A home surveillance camera captured the Buick, with the Saturn following ten seconds later, at 4:28 p.m. The 9-1-1 call by Medvecky was received at 4:48 p.m. One of the patrolmen, who was responding to the scene of the burglary traveling northbound on Rt. 306 towards the Longhitano home, recorded the Buick on his dash camera at 4:51 p.m. driving on Brownell Rd. towards Rt. 306. Taft Street is almost directly across from Brownell Rd., on the east side of Rt. 306. The cell phone records of Diaz and Thomas revealed that between 4:33 p.m. and 5:21 p.m. they had been calling and texting each other. Detective Butler was doubtful the items Longhitano listed as

missing were actually taken. He estimated that approximately $80,000 worth of marijuana products were stolen in the heist.

{¶10} As relevant to this appeal, Medvecky explained the previous owners of the home had passed away and left it to their son, Longhitano. She believed Longhitano's son Anthony was living there. She saw Anthony "quite frequently," and while she did not see him every day, she would see him "come and go" and "play with his dog outside." She observed Anthony leaving for work in the morning and returning in the evening, and she saw him doing yard work on the weekends. Medvecky saw Anthony on the morning of the break-in. Frimel similarly testified that he believed Anthony was living in the home. He also saw Longhitano "on a fairly regular basis." Detective Ryan Butler testified that Longhitano told him in a police interview that no one lived in the home.

{¶11} Longhitano also testified to the occupancy of his home, explaining that before his mother died, she had moved in with him, but she would still return to her home and spend the night or the day there. After she died, either Longhitano, his wife, or Anthony would spend an evening there or visit during the day. All three kept clothes in the closets, one of the beds was made up, and the house was fully furnished. The house was still in probate, the utilities were on, and the family did the house and yard work.

{¶12} The jury found Diaz guilty on all three counts. Count Three, Complicity to Theft had been tried as a first-degree misdemeanor, in violation of R.C. 2923.03(A)(1) and 2913.02(A)(1), instead of a fifth-degree felony as charged in the indictment. After a presentence investigation, a sentencing hearing was held at which the court found the counts merged for purposes of sentencing, and the State elected to proceed on Count

One, Complicity to Burglary. The trial court sentenced Diaz to an indefinite prison term of a minimum of five years up to a maximum of seven and one-half years.

{¶13} Diaz timely filed his appeal and raises two assignments of error:

{¶14} "[1.] The convictions cannot stand because they are against the manifest weight of the evidence.

{¶15} "[2.] The evidence was not sufficient to establish the appellant's guilt."

{¶16} We address Diaz's assignments of error together since they are interrelated. *See State v. Barnes*, 2023-Ohio-353, ¶ 43 (11th Dist.) ("Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the weight of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.)).

{¶17} In his first and second assignments of error, Diaz challenges the sufficiency of the evidence and the manifest weight of the evidence as it relates to his conviction of complicity to commit burglary. More specifically, he contends there was no evidence that linked him to the crowbar, that he aided or abetted Thomas, or that the Longhitano home was a permanent or temporary habitation.

{¶18} In reviewing the sufficiency of the evidence, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value[.]" *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at paragraph two of the syllabus. Essentially, the court asks whether the evidence against a defendant, if believed, supports the conviction. *Id.*

Case No. 2024-L-077

**{¶19}** Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law . . . weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387(1997).

**{¶20}** In reviewing whether the conviction runs counter to the manifest weight of the evidence, the appellate court sits as a "thirteenth juror." *Thompkins* at 387. The court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id*., quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). We will reverse the trial court's decision to convict and grant a new trial only in "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

**{¶21}** Fundamentally, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). "A fact finder is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Fetty*, 2012-Ohio-6127, ¶ 58 (11th Dist.).

**{¶22}** Pursuant to R.C. 2923.03(A)(1), the State was required to introduce evidence from which a trier of fact could conclude that Diaz, "acting with the kind of culpability required for the commission" of burglary, "solicit[ed] or procure[d] another to commit" burglary in violation of R.C. 2911.12(A)(2), which prohibits a person "by force, stealth, or deception . . . [from trespassing] in an occupied structure or in a separately

secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]" A defendant who is complicit in the commission of an offense "is prosecuted and punished as if he were a principal offender." R.C. 2923.03(F). *See State v. Attia*, 2021-Ohio-2890, ¶ 63 (11th Dist.).

{¶23} Diaz first contends there was no evidence connecting him to the crowbar because no DNA evidence was found. However, the State introduced evidence from Flock security cameras and Home Depot surveillance cameras that captured Diaz driving to Home Depot and purchasing a crowbar that had the same unique UPC code as the one found at the scene of the burglary. The receipt for the purchase identified Diaz as the purchaser as well as the time and date of the purchase. Thus, there was more than sufficient evidence from which the jury could connect Diaz to the crowbar.

{¶24} Diaz further contends there was no evidence that he solicited or procured Thomas to commit the burglary. R.C. 2923.03 does not define the terms "solicit" or "procure." The trial court used the definitions set forth in the Ohio Jury Instructions, which defines "solicit" as "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear" and "procure" as "to get, obtain, induce, bring about, motivate." *Ohio Jury Instructions*, CR Section 523.03(A) (Rev. Feb. 6, 2016). *See also In re S.J.F.*, 2010-Ohio-5514, ¶ 18 (11th Dist.); *Attia* at ¶ 64. In the context of complicity, the relevant circumstances include the defendant's conduct ""before and after the offense is committed.""" *Attia* at ¶ 70 (11th Dist.), quoting *State v. Johnson*, 93 Ohio St.3d 240, 245 (2001), quoting *State v. Pruett*, 28 Ohio App.2d 29, 34 (4th Dist. 1971). Further, the

Case No. 2024-L-077

definitions of "solicit" and "procure" encompass more than an express request that the principal offender perform a specific act. *Id.* at ¶ 97; *see Johnson* at 245 ("The fact that defendant did not articulate his intent will not allow him to escape responsibility for his clear actions of complicity . . .").

{¶25} The State's evidence and testimony revealed a connection between Diaz and Anthony, and a connection between Diaz and Thomas. Diaz drove to meet Thomas directly after Diaz purchased the crowbar. Their vehicles were captured on Flock cameras, with Diaz leading Thomas to Anthony's audio/visual studio and then in the direction of the Longhitanos' house. Cell phone records revealed Diaz and Thomas were communicating with each other before, during, and after the burglary. Thus, there was sufficient circumstantial evidence from which a jury could conclude that Diaz "solicited" or "procured" Thomas and his accomplice to carry out the burglary. As this court noted in *State v. West*, 2000 WL 1616802, (11th Dist. Oct. 27, 2000), a case appellant cites, in which we affirmed the defendant's conviction for complicity to commit burglary, "a person is guilty of complicity to commit burglary if he acted with the same culpability required for burglary and either aided or abetted another in the commission of the crime, or in the alternative, conspired with another to commit the offense at issue." *Id.* at *6. Similarly here, there is more than sufficient circumstantial evidence of Diaz's culpability before, during, and after the incident to find he "solicited" or "procured" another to commit burglary.

{¶26} Lastly, Diaz contends there was no evidence that the Longhitano home was a permanent or temporary habitation. "The phrase 'permanent or temporary habitation' is not defined in the revised code for R.C. 2911.12(A)(2)." *State v. Blenman*, 2021-Ohio-

Case No. 2024-L-077

3076, ¶ 15 (11th Dist.) "'If a term is not defined in the Revised Code, then the common, everyday meaning of the term governs.'" *Id*., quoting *State v. Martin*, 2016-Ohio-453, ¶ 11 (12th Dist.), citing *State v. White*, 29 Ohio St.3d 39, 40 (1987). "As defined by Black's Law Dictionary, a 'habitation' is '[a] dwelling place; a domicile,' and a domicile 'requires bodily presence plus an intention to make the place one's home.'" *Id.*

{¶27} The State's evidence revealed that the Longhitanos' neighbors assumed Anthony lived at the Longhitano home, and they saw him "frequently," including on the morning of the burglary. They regularly observed him doing yard work, playing with his dog, leaving for work in the morning, and returning from work in the evening. Anthony's dog was inside the home when the burglary occurred. Longhitano testified that he, his wife, and Anthony spent the night at the house occasionally; the whole family pitched in with the yard work; and he paid for the bills associated with the house, including the monthly utilities. We recognize Detective Butler testified that Longhitano stated in his police interview that no one was permanently or temporarily residing in the home, contradicting Longhitano's testimony; however, the "[t]he choice between credible witnesses and their conflicting testimony" is for the trier of fact. *Awan*, 22 Ohio St.3d at 123. Even if the jury found Longhitano was not a credible witness, there was sufficient evidence from the neighbors' testimony and the dog's presence that the house was being used as a permanent or, at the very least, a temporary habitation.

{¶28} In regard to the manifest weight of the evidence argument, we cannot conclude the jury so lost its way or created a manifest miscarriage of justice based upon the testimony and evidence presented at trial. The State carried its burden of production

Case No. 2024-L-077

as to the sufficiency of the evidence, and the jury's finding of guilt does not run counter to the manifest weight of the evidence.

{¶29} Finding Diaz's assignments of error to be without merit, we affirm the judgment of the Lake County Court of Common Pleas.

ROBERT J. PATTON, P.J.,

JOHN J. EKLUND, J.,

concur.

Case No. 2024-L-077

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant's assignments of error are without merit.  It is the judgment and order of this court that the judgment of the Lake County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.


_____
JUDGE MATT LYNCH


_____
PRESIDING JUDGE ROBERT J. PATTON,
concurs


_____
JUDGE JOHN J. EKLUND,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2024-L-077