[Cite as *State v. Barnes*, 2023-Ohio-353.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

JOSHUA KENNETH BARNES,

        Defendant-Appellant.

**CASE NO. 2022-T-0061**

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2021 CR 00735

**O P I N I O N**

Decided: February 6, 2023
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Plaintiff-Appellee).

*Catherine R. Meehan*, Patituce & Associates, LLC, 16855 Foltz Industrial Parkway, Strongsville, OH 44149 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Joshua Kenneth Barnes, appeals his convictions for Rape and other crimes in the Trumbull County Court of Common Pleas. For the following reasons, we affirm the convictions.

{¶2} On September 23, 2021, the Trumbull County Grand Jury indicted Barnes on the following charges: Rape (Counts 1-5), felonies of the first degree in violation of R.C. 2907.02(A)(1)(b) and (B) and R.C. 2971.03(B)(1)(c); Unlawful Sexual Conduct with a Minor (Counts 6-7), felonies of the third degree in violation of R.C. 2907.04(A) and

(B)(3); Interference with Custody (Count 8), a misdemeanor of the first degree in violation of R.C. 2919.23(A)(1) and (D)(1) and (2); and Furnishing Beer or Intoxicating Liquor to Underage Person (Counts 9-10), a misdemeanor in violation of R.C. 4301.69(A) and R.C. 4301.99(I).

{¶3} The charges were tried to a jury between April 25 and 28, 2022. At trial, the following relevant testimony was presented:

{¶4} P.P. testified that her date of birth is May 10, 2008, and that she was age thirteen at the time of trial. Currently she resides at a juvenile detention center because she is "very known for running away." P.P. moved to Ohio in December 2018 and lived on Hartzell Avenue in Niles with her father (Raul or Rudy Posadas), her aunt (Maricella Posadas), her cousin (Barnes), and his two children.

{¶5} On New Year's Eve, Barnes was babysitting P.P. While they were watching a movie, Barnes asked her to "cuddle and sit with him." She complied because "he was babysitting with me and I was afraid to not listen to him because I was gonna get in trouble." Barnes began to touch her and asked if it was okay. P.P. said yes, "just being ten and scared of not listening and thinking I was gonna get in trouble." Barnes eventually penetrated her digitally and stopped, according to P.P., because he knew she was uncomfortable.[1]

{¶6} The next day, P.P.'s father was still absent from the home. Barnes and P.P. were again watching television toward evening time when he performed cunnilingus on

---

1. These events are the basis for Count 1 Rape.

2

Case No. 2022-T-0061

her.[2] Barnes stopped but continued to be physical with her, touching her and kissing her when people were not around.

{¶7} In May 2019, shortly after her eleventh birthday, Barnes had intercourse with P.P. in the attic of the house. P.P. testified that "it hurt" but that she was afraid to say anything. Before moving to Ohio, P.P. was being raised by her grandparents who were very strict with her about respecting her elders. Sexual encounters with Barnes were frequent thereafter.

{¶8} Barnes eventually moved into an apartment nearby on Bentley Avenue with his girlfriend (Maddy). In December 2020, Barnes asked P.P. to spend the night. P.P. asked her father's permission: "I was afraid that if I didn't listen to him, something bad was either going to happen to me, like, physically being hurt or just something * * * bad was going to happen." Later, when "everything came out," Barnes threatened that he would make her life a living hell if she told anybody. Her father allowed her to spend the night because he trusted Barnes.

{¶9} Barnes decided to go "exploring," i.e., visit abandoned buildings, that evening with P.P. and a friend (Jake). Barnes bought beer and allowed P.P. to drink some of it. They spent the evening in an abandoned factory in Warren. After dropping Jake off, Barnes drove around for maybe an hour in the Warren area before stopping behind a church where he and P.P. engaged in fellatio, cunnilingus, and vaginal intercourse.[3]

---

2. These events are the basis for Count 2 Rape.
3. These events are the basis for Counts 3-5 Rape and 9 Furnishing Beer or Intoxicating Liquor to Underage Person.

Case No. 2022-T-0061

{¶10} P.P.'s aunt (Maricella) eventually moved to Lordstown. After an incident involving P.P. running away, she was sent to live with her aunt for a few months. Sometime after P.P.'s thirteenth birthday (May 2021), there was a party at the Lordstown house. Barnes was there and he gave P.P. beer to drink. After she had gone to bed, Barnes came to her room and told her to meet him outside. He told her to climb out the bathroom window because there were surveillance cameras in the house. P.P. debated whether she should go, "but, again, I was scared of saying 'no' and what if he came back." Barnes was drunk and "could be capable of anything."

{¶11} Once outside, Barnes led P.P. through the garage into the basement where they engaged in fellatio. P.P. returned to her room through the bathroom window. As she was climbing inside, she knocked over a stand of toilet paper which worried her because Barnes told her "that if anybody found out * * * [it] could be very bad for him."[4]

{¶12} While P.P. was staying at her aunt's house, her aunt bought her a journal to write down her feelings. She described the incident with Barnes in the journal in an entry dated May 30, 2021. She admitted some of the details in the journal were not true, such as she removed his clothing whereas Barnes actually removed his own clothes.

{¶13} On Father's Day, P.P. was with her father when he received a call from her aunt. Shortly after that Barnes arrived and spoke to her alone. He told her she cannot write things like what she wrote in her journal and that she would have come up with a lie. P.P. told her father that the journal was a fantasy about wanting to sleep with her cousin. After that, P.P. returned to her father's house.

---

4. These events are the basis for Counts 6 Unlawful Sexual Conduct with a Minor and 10 Furnishing Beer of Intoxicating Liquor to Underage Person.

4

{¶14} In August 2021, P.P. and her father had an argument and she walked over to Barnes' house. Barnes told her that her father was looking for her and she should hide in the backseat of his car. Barnes then left with his girlfriend. P.P. saw her father arrive at the house, knock on the door, and then leave. P.P. spent the night at Barnes' house and returned home the next day.[5]

{¶15} P.P. described an incident where she and Barnes were almost caught. He had taken her late at night to Waddell Park in Niles. They were interrupted by the approach of a police car. Barnes told her to hide in the woods and he would tell the officer that he was at the park for a run after working a late shift.

{¶16} Sometime later "towards fall," Barnes texted P.P. that she should come over to his house. Once there, he had her engage in fellatio.[6] They were interrupted by his girlfriend. P.P. left and eventually returned home. Later that evening, she admitted to her father that Barnes had been raping her.

{¶17} Zachary Zigmont, a police officer with the City of Niles, testified that, at about 4:30 a.m. on August 17, 2021, he encountered Barnes in Waddell Park. Barnes was out of his vehicle and claimed that he was at the park running after getting off of a midnight shift.

{¶18} Raul Posadas testified that, prior to her moving to Ohio, P.P. was in the custody of her grandparents who lived in Texas. He confirmed that Barnes would babysit P.P. and that P.P. was expected to listen to him. After its discovery, Barnes presented

---

5. These events are the basis for Count 8 Interference with Custody.
6. These events are the basis for Count 7 Unlawful Sexual Conduct with a Minor.

5

Case No. 2022-T-0061

him with P.P.'s journal describing the fellatio, and P.P. explained that she was writing about another Barnes who lived in Texas.

{¶19} On the night that P.P. revealed that she and Barnes had been having sex, Raul contacted Barnes and had P.P. confront him with the accusation. The manner in which Barnes responded to and denied the accusation convinced Raul that P.P. was telling the truth. He decided he wanted Barnes' confession before going to the authorities. The following day, Raul repeatedly texted Barnes that they needed to talk. When Barnes responded, Raul recorded the conversation which was played for the jury. During the conversation, Barnes admitted to sleeping with P.P. Raul deleted the texts he sent to Barnes before surrendering his phone to the police, although they were later recovered.

{¶20} Wesley Washington, a police officer for the City of Niles, testified that, on August 23, 2021, he took the initial police report from Raul of the allegations against Barnes. He attempted to interview Barnes' girlfriend but she asserted her right against self-incrimination.

{¶21} Rasheeda Kalam, a pediatric social worker at the Akron Children's Hospital in Boardman, testified that she interviewed P.P. in the emergency room on August 23, 2021. P.P. reported being the victim of sexual assault and rape. She reported recent sexual activity taking place on August 20. P.P. volunteered that the perpetrator provided alcohol, vapes, and marijuana as a "reward."

{¶22} Monique Malmer, a nurse practitioner in the Child Advocacy Center at the Akron Children's Hospital in Boardman, observed the medical diagnostic interview of P.P. by Melanie Deluca and, afterwards, conducted a physical examination on August 31, 2021. P.P. reported that during the initial time that penetration of the vagina occurred

6

there was pain that would continue into the following day. The physical examination did not reveal evidence of physical injury or sexually transmitted disease.

{¶23} Elva Wyandt, an aunt of both P.P. and Barnes, testified that she and her family were visiting with Maricella on Memorial Day weekend in 2021. They had dogs with them that are prone to barking. Elva has known P.P. from a young age and noted that she has difficulty telling the truth.

{¶24} Maricella Posadas testified that she leased the house on Hartzell Avenue where she, Barnes, Raul and P.P. used to live. P.P. would use her iPad and conduct searches for sexual subjects. Eventually Maricella moved in with her boyfriend in Lordstown. On Memorial Day weekend in 2021, she slept in the living room with their dogs. P.P.'s bedroom in the Lordstown residence had its own window that was larger than the one in the bathroom.

{¶25} Joshua Barnes, age thirty at the time of trial, testified and denied ever babysitting P.P. He denied the events associated with the "exploring" episode in December 2020. He denied the events associated with Memorial Day 2021. He admitted the encounter with Officer Zigmont in Waddell Park, but claimed he was there to go running and that P.P. was not present. He admitted that P.P. spent the night at his apartment on Bentley Avenue while she and her father were fighting. He denied hiding her in his car or otherwise trying to interfere with her father's custody.

{¶26} Barnes testified that he did not invite P.P. to his apartment on August 20, 2021. He was taking a nap that day and awoke to find P.P. on him. His clothes had been removed and his girlfriend saw him before he could get P.P. to leave. When he spoke

7

with Raul, he admitted to having sex with P.P. because he thought Raul would not report it to the police if he confessed privately.

{¶27} Following the conclusion of testimony, the jury found Barnes guilty of all counts of the Indictment.

{¶28} On May 24, 2022, a sentencing hearing was held and, on June 8, 2022, the trial court issued its Entry on Sentence. The court sentenced Barnes as follows: for each count of Rape (Counts 1 to 5), life in prison with the possibility of parole after twenty-five years; for each count of Unlawful Sexual Conduct with a Minor (Counts 6 and 7), thirty-six months in prison; for Interference with Custody (Count 8), one hundred and eighty days in jail; and for each count of Furnishing Beer or Intoxicating Liquor to Underage Person (Counts 9 and 10), thirty days in jail. The sentences were ordered to be served concurrently for an aggregate sentence of life with the possibility of parole after twenty-five years.[7]

{¶29} On June 21, 2022, Barnes filed a Notice of Appeal. On appeal, he raises the following assignments of error:

> [1.] The State failed to present sufficient evidence to prove appellant compelled P.P. to su[b]mit to sexual conduct by force or threat of force to warrant the imposition of a sentence of 25 years to life.
>
> [2.] Appellant's conviction was against the manifest weight of the evidence.

---

7. On August 16, 2022, the trial court issued a Nunc Pro Tunc Entry on Sentence correcting the date of Barnes' birth.

Case No. 2022-T-0061

[3.] The trial court erred when it denied Appellant's R. 29 motion for acquittal as to counts three, four, and five of the Indictment.

[4.] The trial court erred in overruling Appellant's objection to hearsay statements thereby depriving Appellant of his right to a fair trial.

[5.] The admission of Monique Malmer's opinion regarding the veracity of P.P. was improper.

{¶30} The assignments of error will be addressed out of order. The last two assignments challenging the admission of evidence will be addressed first.

{¶31} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). A trial court "does not have the discretion to admit evidence that is clearly not permitted by law * * * such as whether testimony constitutes hearsay." *State v. Davis*, 11th Dist. Lake No. 2019-L-170, 2021-Ohio-237, ¶ 133. In such cases, the lower court's evidentiary ruling is reviewed de novo. *Id.*

{¶32} In the fifth assignment of error, Barnes argues that the trial court improperly allowed Monique Malmer to testify that the results of P.P.'s medical examination "were consistent with her disclosure of sexual abuse," and, thus, "the jury heard testimony from an expert which suggested that P.P. was truthful in her disclosure." Brief of appellant at 27. According to Barnes, this testimony violates the rule that "[a]n expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston*, 46 Ohio St.3d 108, 545 N.E.2d 1220 (1989), syllabus.

9

**{¶33}** Barnes mischaracterizes Malmer's testimony as opinion testimony as to whether P.P. was being truthful. Rather, her testimony was that the absence of physical injury is not inconsistent with the reported sexual abuse. Such testimony is simply not probative of whether the reported sexual abuse actually occurred. At best, it forestalls the possible inference by the trier of fact that an absence of physical injury would mean that P.P. is lying. The argument advanced by Barnes has been addressed by the Ohio Supreme Court:

> The argument * * * fails to distinguish between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility insofar as it supports the prosecution's efforts to prove that a child *has* been abused. *Boston*'s syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (*e.g.*, the child does or does not appear to be fantasizing or to have been programmed, or is or is not truthful in accusing a particular person). It does not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity.

*State v. Stowers*, 81 Ohio St.3d 260, 262-263, 690 N.E.2d 881 (1998).

**{¶34}** The fifth assignment of error is without merit.

**{¶35}** In the fourth assignment of error, Barnes argues that the trial court erred in admitting, over the objection of defense counsel, the hearsay testimony of Rasheeda Kalam that P.P. reported Barnes giving her alcohol, vapes, and marijuana as a reward.

10

Case No. 2022-T-0061

**{¶36}** Ohio Evidence Rule 803 provides that statements made for purposes of medical diagnosis or treatment "are not excluded by the hearsay rule, even though the declarant is available as a witness." The exception is applied to the following: "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). The Staff Notes further provide: "The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted."

**{¶37}** In applying Evidence Rule 803(4) to a child's statements, the Ohio Supreme Court has stated that the issue is "whether [the] statements were made for purposes of diagnosis and treatment rather than for some other purpose." *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 47. "The trial court's considerations of the purpose of the child's statements will depend on the facts of the particular case." *Id.* at ¶ 49. "[A]fter considering the circumstances surrounding a child victim's statements," the court "retains the discretion to admit the testimony." *Id.* at ¶ 48. "[T]he fact that information gathered for medical purposes is subsequently used by the state does not change the fact that the statements were made for medical diagnosis and treatment." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 43.

**{¶38}** In the present case, P.P. underwent the "SCAN" (suspected child abuse or neglect) procedure in the emergency room of the Akron Children's Hospital in Boardman.

11

After speaking with Kalam, P.P. was examined by a doctor. Kalam described the procedure thusly:

> [W]hen the child arrives, they're triaged and the nurse takes their blood pressure, their weight, and makes sure there's no immediate medical concerns. And then they're taken to a room. A social worker is contacted. And then we interview the parents and the patient separately. And we get the history of the presenting situation. * * * We're working alongside the doctor throughout the process. * * * After I talk to the parent, I'll talk to the doctor, give them the information that the parent has given me and then I'll talk to the patient. And then I'll go back and talk to the doctor again. And then I'll make the referrals. Along with the outside referrals, like Children Services and the police, we also contact the Child Advocacy Center. And depending on if it's physical or sexual abuse, they kind of lead us and the doctor on what additional medical exams, if needed, to give the child.

{¶39} We find no abuse of discretion in the admission of the hearsay regarding Barnes supplying P.P. with alcohol, vapes, and marijuana. Statements regarding the use of alcohol, nicotine, and/or recreational drugs by a thirteen-year-old child are certainly relevant to proscribing care and treatment for that child. Contrary to Barnes' position, such information reasonably includes the source of the substances and/or the manner in which the child obtained them. Nor does anything in the circumstances surrounding Kalam's interview of P.P. suggest a purpose other than medical diagnosis when the

12

statements were made. While P.P.'s disclosure to Kalam may have been prejudicial to Barnes, it did not violate the hearsay rules. *State v. Smith*, 12th Dist. Clermont No. CA2019-10-075, 2020-Ohio-4008, ¶ 46 (statements made to social workers that, inter alia, Smith "supplied [the victim] with alcohol, * * * were all answers to questions designed to determine the extent of the abuse * * * and were made for the purpose of forming a medical diagnosis"); *State v. Caldwell*, 2013-Ohio-5017, 1 N.E.3d 858, ¶ 35 (8th Dist.) (statements made to "Dr. Mark Feingold about domestic violence, neglect, and alcohol problems in the victim's home * * * risk factors correlat[ing] with abusive injuries to children * * * were made for purposes of medical diagnosis and treatment").

**{¶40}** The fourth assignment of error is without merit.

**{¶41}** The first three assignments of error challenge the sufficiency and manifest weight of the evidence.

**{¶42}** Criminal Rule 29(A) provides that "[t]he court * * * shall order the entry of a judgment of acquittal of one or more offenses charged * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶43}** Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio

13

St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the weight of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Heald*, 11th Dist. Lake Nos. 2021-L-111 and 2021-L-112, 2022-Ohio-2282, ¶ 19.

{¶44} In the first assignment of error, Barnes challenges the five counts of Rape (Counts 1 to 5) and a single count of Furnishing Beer or Intoxicating Liquor to Underage Person (Count 9) on the grounds of sufficiency.

{¶45} With respect to the Rape counts, Barnes maintains that there was insufficient evidence that he compelled P.P. to submit by force or threat of force to impose a prison term of twenty-five years to life.

{¶46} When an offender is convicted of Rape and "[t]he other person is less than thirteen years of age," "the court shall impose * * *[i]f the offender purposely compels the victim to submit by force or threat of force * * * a minimum term of twenty-five years and a maximum of life imprisonment." R.C. 2907.02(A)(1)(b) and R.C. 2971.03(B)(1)(c). "'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person of thing." R.C. 2901.01(A)(1). "The force and violence necessary in rape is naturally a relative term, depending upon the age, size and strength

14

Case No. 2022-T-0061

of the parties and their relation to each other * * *." (Citation omitted.) *State v. Eskridge*, 38 Ohio St.3d 56, 58, 526 N.E.2d 304 (1988).

**{¶47}** The Ohio Supreme Court has held that "[a] person in position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) * * * without evidence of express threat of harm or evidence of significant physical restraint." *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998), syllabus.

> We recognize that it is nearly impossible to imagine the rape of a child without force involved. Clearly, a child cannot be found to have consented to rape. However, in order to prove the element of force necessary to sentence the defendant to life imprisonment, the statute requires that some amount of force must be proven beyond that force inherent in the crime itself. Yet "'[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established.'" *Eskridge*, 38 Ohio St.3d at 58-59, 526 N.E.2d at 306, citing *State v. Fowler* (1985), 27 Ohio App.3d 149, 154, 27 OBR 182, 187, 500 N.E.2d 390, 395.

*Id.* at 327-328.

**{¶48}** We find that sufficient evidence existed that Barnes compelled P.P. to submit by force or threat of force to sustain the Rape convictions. Common to all the counts is the fact that Barnes held a position of authority over P.P. – her father trusted

15

Case No. 2022-T-0061

Barnes and she was expected to obey him – and that there is a seventeen-year difference in age between them. When the abuse began in January 2019, P.P. was ten years old and Barnes was twenty-seven years old. P.P. testified repeatedly that she believed she had to be compliant or else she would get in trouble or something bad would happen to her.

{¶49} It is worth noting that P.P. had been living in Ohio for less than a month when the abuse started. She did not have a firm relationship with her father and no prior experience with her cousin Barnes. It is also worth noting that P.P. claimed that she was molested in Texas although the matter was not pursued. When P.P.'s father confronted Barnes about her allegations, he reproached him with, "after everything you knew that kid went through down in Texas, man, you knew she was abused down there." When asked why she did not refuse to go with Barnes, P.P. explained: "If you're a ten-year-old girl who has been raised on always, you know, respecting your elders and not knowing whether people are going to believe you or if you're going to get hurt physically and, you know, you're already mentally exhausted from lying, it's kind of hard * * *."

{¶50} With respect to the first two counts of Rape, on New Year's Eve and New Year's Day, we note P.P.'s testimony that she believed he stopped because she was uncomfortable ("I wasn't saying anything") and he did not want her "to freak out on him." While this testimony is of dubious value as to what Barnes was actually thinking, it does demonstrate P.P.'s own state of mind during the incidents. Notably, these two incidents were followed by several months of grooming activity until the sexual conduct escalated in May. Particular to the latter three counts of Rape, in December 2020, we note that Barnes had been driving P.P. around all night and that they had been drinking. When

16

Barnes asked her into the back seat, P.P. testified: "him being in charge of me and stuff and me not wanting to say 'no,' I – I went in the back seat with him." Again, the foregoing demonstrates the minimal elements of force necessary to support the convictions. *Compare State v. Lawson*, 11th Dist. Lake No. 2021-L-133, 2022-Ohio-3972, ¶ 40 (the victim testified "she never tried to stop Appellant's conduct" because "she was afraid he would do something to her because he was bigger") and 41 (the victim "testified that her mother told her Appellant was in charge and to 'obey' him when she was in his care"); *State v. Skeins*, 11th Dist. Trumbull No. 2017-T-0018, 2018-Ohio-134, ¶ 46 ("A.K.'s statements that Skeins 'made' her squeeze his penis and 'made' her go upstairs and then he put his penis in her mouth satisfy this minimal force requirement especially in light of her young age at the time and the fact that Skeins was acting as caregiver").

{¶51} Barnes also argues under this assignment of error that there was insufficient evidence to convict him of Furnishing Beer or Intoxicating Liquor to Underage Person as charged in Count 9 (December 2020), i.e., that he did "buy beer or intoxicating liquor for an underage person" or that he did "furnish it to an underage person." R.C. 4301.69(A). "P.P. did not testify that Appellant bought the beer for her or that he furnished it to her," but, rather, that P.P. was thirsty and so proceeded to "get a beer." Brief of appellant at 17.

{¶52} Whether Barnes purchased the beer to share with P.P. or not is irrelevant. It was his beer and he allowed her to drink it. The evidence is that Barnes purchased beer and that he, his friend, and P.P. drank it while driving around. This court has construed "furnish" to mean "supply" and "provide." *State v. Skaggs*, 97 Ohio App.3d 15, 19, 646 N.E.2d 190 (11th Dist.1994). That fairly describes Barnes' conduct in allowing

17

P.P. to get one of his beers. *Compare State v. Harris*, 6th Dist. Lucas No. L-85-057, 1986 WL 5941, *6 ("[t]he girls drank the beer in appellant's presence and with her full knowledge").

{¶53} The first assignment of error is without merit.

{¶54} In the third assignment of error, Barnes argues that there was insufficient evidence of venue to sustain the convictions related to the December 2020 exploring episode, i.e., Rape (Counts 3 to 5) and Furnishing Beer or Intoxicating Liquor to Underage Person (Count 9).

{¶55} "Under Article I, Section 10 and R.C. 2901.12, evidence of proper venue must be presented in order to sustain a conviction for an offense." *State v. Hampton*, 134 Ohio St.3d 447, 2012Jo-Ohio-5688, 983 N.E.2d 324, ¶ 20. "Although it is not a material element of the offense charged, venue is a fact which must be proved in criminal prosecutions unless it is waived by the defendant." *State v. Headley*, 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). "Therefore, a 'conviction may not be had' if the state fails to prove beyond a reasonable doubt that the defendant committed the alleged offense or an element of the offense in the charging county." (Citation omitted.) *State v. Foreman*, 166 Ohio St.3d 204, 2021-Ohio-3409, 184 N.E.3d 70, ¶ 13.

{¶56} On the night in question, J.J. testified as follows regarding the time between dropping Barnes' friend off and the sexual incidents behind a church: "At this point, I had no idea where we were because we drove around for, like, maybe an hour [after dropping the friend off]. I had no idea what city or what county we were in, but we were pretty close. That's all I knew." Barnes maintains that this testimony is insufficient to prove that the conduct occurred in Trumbull County.

18

Case No. 2022-T-0061

{¶57} We find no deficiency in the State's evidence with respect to venue. Ohio's venue statute provides: "When the offense or any element of the offense was committed in [a] * * * motor vehicle, * * * and it cannot reasonably be determined in which jurisdiction the offense was committed, the offender may be tried in any jurisdiction through which the * * * motor vehicle * * * passed." R.C. 2901.12(B). Here, the Rapes occurred in the backseat of Barnes' vehicle, which unquestionably passed through Trumbull County inasmuch as Barnes' residence was located in Trumbull County. The statute additionally provides: "When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." R.C. 2901.12(H). Evidence that "[t]he offenses were committed as part of the same * * * chain of events" constitutes "prima-facie evidence of a course of criminal conduct." R.C. 2901.12(H)(3). Here, P.P. testified that Barnes purchased the beer that he furnished her with in Niles. Thus, one of the offenses in the chain of events culminating in the Rapes occurred in Trumbull County thereby establishing venue for all the offenses. *See State v. Keeton*, 5th Dist. Richland No. 03 CA 43, 2004-Ohio-3676, ¶ 45-61 (discussing venue pursuant to R.C. 2901.12(B) and (H)(3)).

{¶58} The third assignment of error is without merit.

{¶59} In the second assignment of error, Barnes argues that his convictions are against the manifest weight of the evidence, primarily on the grounds that "P.P.'s testimony in this case is questionable as her veracity is doubtful at best." Brief of appellant at 17. He notes the considerable evidence that P.P. is not always truthful. As she confided in her journal, "I still lie and I can never tell the truth." That she would lie and

19

otherwise be disobedient was also confirmed by the testimony of her father and aunts. Barnes maintains this undermines P.P.'s claims that she felt compelled to submit to him out of a respect for authority.

{¶60} Barnes also points out that there were discrepancies between the testimony given by the State's witnesses. For example, P.P.'s testimony regarding the incident with the journal differed from her father's (she testified that she explained the journal entry as fantasy and he testified that she claimed it was about a boy in Texas). Barnes asserts that portions of P.P.'s testimony are inherently incredible, such as her sneaking out the bathroom window without waking the house guests or dogs or that she would sneak out the bathroom window when her bedroom had its own window. Finally, Barnes complains of the lack of substantive police investigation to corroborate P.P.'s allegations and lack of corroborating physical evidence.

{¶61} Although Barnes raises valid points for consideration, his arguments do not compel the conclusion that his convictions constitute a manifest miscarriage of justice such that a new trial must be ordered. None of the points raised by Barnes necessarily demonstrate that P.P. was fabricating the allegations against him. Moreover, there is corroborating evidence to support those allegations. The journal entry is evidence of sexual conduct between P.P. and Barnes. After the journal's discovery, Barnes continued to interact with P.P. even without her father's knowledge. P.P.'s account of the incident in Waddell Park is no more unlikely than Barnes' account, i.e., it is just as probable that she was present as it is that he would have told her about running in the park one morning. Barnes admitted that his girlfriend discovered them engaged in sexual activity. His explanation that P.P. entered his home and initiated the activity without his awareness is

20

dubious. Lastly, Barnes admitted that he was having sexual intercourse with P.P. Assuming, arguendo, that Barnes only made the admission in an attempt to dissuade P.P.'s father from revealing the allegations to the family and/or authorities, it is a remarkably damning admission nonetheless.

{¶62} When considering the evidence in the record on balance, the present case is one in which deference to the trier of fact's resolution of conflicts in the evidence is merited. *State v. Wymer*, 11th Dist. Trumbull No. 2021-T-0014, 2022-Ohio-4795, ¶ 47 ("[w]hile an appellate court engages in a limited weighing of the evidence considering challenges based on the manifest weight of the evidence, the court nevertheless shows some deference to the trier of fact's determinations regarding the import and credibility of the evidence") (cases cited).

{¶63} The second assignment of error is without merit.

{¶64} For the foregoing reasons, Barnes' convictions are affirmed. Costs to be taxed against the appellant.

JOHN J. EKLUND, P.J,

MARY JANE TRAPP, J.,

concur.

21

Case No. 2022-T-0061