[Cite as *State v. Hare*, 2023-Ohio-1623.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

TRAVIS LEE HARE,

        Defendant-Appellant.

CASE NO. 2022-A-0048

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 00390

**O P I N I O N**

Decided: May 15, 2023
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, *Christopher R. Fortunato* and *Christine Davis*, Assistant Prosecutors, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Edward M. Heindel*, 2200 Terminal Tower, 50 Public Square, Cleveland, OH 44113 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Travis Lee Hare, appeals his convictions for Felonious Assault and Using Weapons While Intoxicated in the Ashtabula County Court of Common Pleas. For the following reasons, Hare's convictions are affirmed.

{¶2} On September 23, 2020, the Ashtabula County Grand Jury indicted Hare for Felonious Assault (Count 1), a felony of the second degree in violation of R.C 2903.11(A)(1) and (D)(1)(a); Felonious Assault (Count 2), a felony of the second degree in violation of R.C. 2903.11(A)(2) and (D)(1)(a); and Using Weapons While Intoxicated

(Count 3), a misdemeanor of the first degree in violation of R.C. 2923.15(A) and (B). Counts 1 and 2 included a Firearm Specification pursuant to R.C. 2941.145(A). All three Counts included a Specification for Forfeiture of a Weapon pursuant to R.C. 2941.1417(A).

{¶3} The case was tried before a jury between March 29 and April 1, 2022. The following testimony and evidence were presented:

{¶4} Patrolman Aaron McCracken of the Ashtabula Police Department testified that, in the early hours of July 5, 2020, he responded to a dispatch of a fight involving multiple persons with gunshots reported. McCracken arrived at Cornell Avenue in Ashtabula to find a chaotic scene: "There was a bunch of people fighting, people screaming and running everywhere." A woman approached and indicated that the person the police were looking for was in her house. McCracken made contact with the woman's son, Hare, who advised that he had a gun and a CCW permit and had heard shots fired but that he did not fire them. McCracken left to search for a victim. McCracken found Undray Bradley, who was bleeding badly from both legs, and applied tourniquets to each leg. After Bradley was delivered to EMS, witnesses directed McCracken to Hare as the shooter.

{¶5} Officer McCracken then took Hare into custody. At the police station, Hare said that "he didn't shoot anybody and that he was intoxicated and very nervous." McCracken advised him to stop talking and that he would be interviewed later by detectives. In subsequent searches of Hare's residence, a handgun (a Smith & Wesson .40 caliber) and magazine were found. Shell casings were also found that matched the gun recovered from the house.

2

Case No. 2022-A-0048

{¶6} Undray Bradley ("Bradley") testified that on July 4-5, 2020, he was visiting his brother ("Orlando") for a cookout. An argument developed between Bradley and some of the neighbors. A female spit on Bradley, he slapped her, and "that's when my brother and everybody just started getting out of control." In the ensuing melee, Bradley traded punches with a woman named Kathy Ortiz and her boyfriend. Bradley noticed a man come from the porch of one of the neighboring houses with a gun. Bradley described what happened:

> He said, I'm going to kill you ni***r. And I'm, like, oh, really? * * * I'm coming at him. I'm, like, literally coming at him. And he * * * pointed it at me, but then when he actually pointed it at me, he shot two in the ground, and then he pointed it back at me. He's, like, I'm going to kill you. I'm, like, whatever. So, I'm still * * * coming up on him. I didn't think he was going to shoot me, and he just * * * pulled the trigger.

Two bullets became lodged in Bradley's body. He ran back to his car, which also had bullet holes, and passed out and/or collapsed.

{¶7} Jessica Bradley testified that she was Orlando Bradley's wife. She retrieved video from a home security camera which recorded about twenty seconds of the incident. The video depicted Bradley running to his car saying he had been shot while additional shots could be heard being fired.

{¶8} Detective Wesley Burns of the Ashtabula Police Department testified that, on the night in question, five shell casings were recovered from the roadway on Cornell Avenue. In the house where Hare was living, a Smith & Wesson handgun secured by a gunlock was recovered from his mother's bedroom and a loaded magazine was recovered from Hare's bedroom.

3

{¶9} Detective Michael Palinkas of the Ashtabula Police Department testified that he interviewed Hare at the Ashtabula Police Department. Hare related that when the fighting started, he was on another street. He returned to Cornell and saw Bradley shove a neighbor, Kathy Ortiz, to the ground. He went inside his house. He heard "a series of pops outside" and looked out the window to see someone in a hoody running away. He remained inside until he was taken into custody by the police. He denied doing anything wrong. Hare admitted that he had considered getting his gun but did not do so because he felt he was too intoxicated to possess a gun at that time.

{¶10} Detective Palinkas advised Hare that he had been identified as the shooter and that there might be video of the incident. Hare then reported that he was there when the altercation began between the people from the Bradley house and the people from the Higgins/Ortiz house. He heard Bradley say that somebody was going to be stabbed this evening and someone else tell him to "get his shit" which he understood to be his firearm. After he returned with the gun, he saw Bradley reach into his waistband. He fired two shots at the ground to try to get Bradley and his group to back up. Hare did not claim to have seen anyone with a weapon that evening.

{¶11} Detective Palinkas testified that interviews are normally recorded but, for reasons unknown, the interview of Hare was purged (rewritten over) from the recording system and that the only hardcopy of the interview that had been produced was lost. Palinkas had made a written summary of the interview which he had reviewed in preparation for testifying. Palinkas did not think that Hare was intoxicated at the time of the interview.

4

{¶12} Katherine Ortiz-Alvarez testified on behalf of the defense that, in July 2020, she lived on Cornell Avenue and that Hare and Orlando Bradley were her neighbors. On the evening in question, she was having a party at which Hare was present. Over the course of the evening, Hare had drunk three or four beers and had a couple of "jello-shots." After the fighting started, she observed the Bradley brothers and Webber confront her son (Antonio). She approached the group to learn what was happening when Bradley punched her, knocking her to the ground. Then Orlando punched her and her daughter. She heard Bradley say that somebody was going to get stabbed tonight as "he was walking up on" Hare. She testified that Hare "fired warning shots into the ground" and Bradley "was hit." But she did not see Hare point or fire his gun at Bradley.

{¶13} Justin Fourqurean testified for the defense that, on July 4, 2020, he was visiting Kathy Ortiz. Fourqurean stated that the altercation that evening began when Bradley threw a punch at a lady named Jessica Spring. Fourqurean also saw Bradley put his hands on Ortiz. In the ensuing fight, he saw Bradley running at Hare and Hare firing shots "pointed up" like "in the air" but not aimed at anyone.

{¶14} The jury found Hare guilty of Felonious Assault (Count 2) and Using Weapons While Intoxicated with the Specifications, but not guilty of Felonious Assault (Count 1).

{¶15} On May 19, 2022, the sentencing hearing was held. For Felonious Assault, Hare was sentenced to serve a minimum prison term of two years and a maximum term of three years plus a consecutive term of three years for the Firearm Specification. For Using Weapons While Intoxicated, Hare was sentenced to serve one hundred eighty days in the Ashtabula County Jail concurrent with the sentence imposed for Felonious Assault.

5

Case No. 2022-A-0048

{¶16} On June 6, 2022, Hare filed a Notice of Appeal. On appeal, he raises the following assignment of error: "The verdicts are against the manifest weight of the evidence and the sufficiency of the evidence."

{¶17} Criminal Rule 29(A) provides that "[t]he court * * * shall order the entry of a judgment of acquittal of one or more offenses charged * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." In reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶18} Whereas "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). "[A] reviewing court asks whose evidence is more persuasive—the state's or the defendant's?" *Id.* An appellate court must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387. "Since there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the weight of the evidence necessarily must include a finding of

6

sufficiency.'" (Citation omitted.) *State v. Barnes*, 11th Dist. Trumbull No. 2022-T-0061, 2023-Ohio-353, ¶ 43.

{¶19} In order to convict Hare of Felonious Assault, the State was required to prove beyond a reasonable doubt that he did knowingly "[c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). "If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be." R.C. 2901.05(B)(1).

{¶20} "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense," i.e., "if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden." *State v. Messenger*, __ Ohio St.3d __, 2022-Ohio-4562, __ N.E.3d __, ¶ 25. Where, as here, the defendant satisfies this burden of production, the prosecution must satisfy the "burden of disproving the defendant's self-defense claim beyond a reasonable doubt," i.e., the burden "of persuading the jury beyond a reasonable doubt that [the defendant] was not acting in self-defense when he [used force against another]." *Id.* at ¶ 27, 26.

7

Case No. 2022-A-0048

{¶21} The elements of a self-defense claim include the following: "(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger." *Messenger* at ¶ 14.

{¶22} "Implicit in the 'second element of self-defense, i.e., that the defendant's use of deadly force was in "good faith," is the requirement that the degree of force used was "warranted" under the circumstances and "proportionate" to the perceived threat.'" (Citation omitted.) *State v. Kean*, 10th Dist. Franklin No. 17AP-427, 2019-Ohio-1171, ¶ 58; *State v. Montgomery*, 2015-Ohio-4652, 48 N.E.3d 1042, ¶ 16 (12th Dist.) ("[t]he second element of self-defense involves determining whether the defendant's use of force was 'reasonably necessary to repel the attack' or in other words, whether the defendant used excessive force"); *State v. Rose*, 11th Dist. Ashtabula No. 2021-A-0015, 2022-Ohio-3197, ¶ 48 ("[t]he degree of force permitted depends upon what is reasonably necessary to protect that individual from the imminent use of unlawful force") (citation omitted).

{¶23} Hare argues that "[u]nder R.C. § 2901.05 [he] was permitted to engage the Bradley brothers and Webber when they became violent, especially when a female guest was knocked unconscious and threats of stabbings were heard." Brief of Appellant at 11. Considering the facts of the present case, the jury's conclusion that Hare was not justified in the use of force is not against the weight of the evidence. The brawl that occurred on Cornell Avenue was essentially a fist fight that did not warrant the use of deadly force. *State v. Jordan*, 1st Dist. Hamilton No. C-210603, 2022-Ohio-2566, ¶ 60 ("the jury did not

8

clearly lose its way and create a manifest miscarriage of justice by finding that [the] state met its burden of persuasion to show the absence of self-defense" where "Jordan [by stabbing the victim] used more force than was necessary when the men were engaged in a fist fight or tussle"); *State v. Kendricks*, 10th Dist. Franklin Nos. 10AP-114 and 10AP-115, 2010-Ohio-6041, ¶ 41 ("the jury in weighing the credibility of the various witnesses reasonably could conclude defendant was the only one firing a gun and in effect escalated a fist fight into a shoot out").

{¶24} We note that, although Bradley was reported to have threatened that somebody was going to be stabbed, there was no evidence that he brandished or even possessed a knife. Bradley only approached Hare after Hare had retrieved the firearm and brandished it at Bradley. Ortiz was not knocked unconscious. Rather, after being struck by Bradley, Ortiz testified: "I was on the ground. My daughter's fiancé helped me up. I was ready to fight, as anybody would be." Moreover, there was abundant evidence that Hare fired to injure rather than just to scare or warn. Bradley and Webber both testified that Hare pointed the gun directly at Bradley. Bradley was struck in both thighs and Bradley's vehicle was struck. The home security video showed that shots continued to be fired after Bradley had turned and retreated to his vehicle. Significant also is the fact that in the aftermath of the shooting Hare did not assert self-defense or defense of another but attempted to conceal his identity as the shooter and deny his involvement in the shooting. Based on the foregoing, the State satisfied its burden of persuasion on the issue of self-defense.

9

{¶25} Hare argues that "[t]he State also failed to prove that Appellant was under the influence of any substance when handling his firearm so that Count 3 fails." Brief of the appellant at 12. We disagree.

{¶26} In order to convict Hare of Using Weapons While Intoxicated, the State was required to prove beyond a reasonable doubt that he did, "while under the influence of alcohol or any drug of abuse, * * * carry or use any firearm or dangerous ordnance." R.C. 2923.15(A). For the purposes of this statute, "'[u]nder the influence' has been defined as the condition in which a person finds himself after having consumed some intoxicating beverage, whether mild or potent, and in such quantity, whether small or great, that its effect on the person adversely affects his actions, reactions, conduct, movements or mental processes or impairs his reactions to an appreciable degree, under the circumstances then existing so as to deprive him of the clearness of the intellect and control of himself which he would otherwise possess." *State v. Weber*, 2019-Ohio-916, 132 N.E.3d 1140, ¶ 13 (12th Dist.) (cases cited).

{¶27} A defendant's admission that he was intoxicated and testimony that he had been consuming alcohol is sufficient evidence to prove that he is under the influence of alcohol. In the present case, Hare admitted to Officer McCracken and Detective Palinkas that he was intoxicated and did not or at least should not have been handling a firearm. Webber and Ortiz both testified to having seen Hare consuming alcohol throughout the evening. Moreover, there was witness testimony that Hare had been carrying his firearm and had even discharged it prior to melee that occurred around midnight. Webber had earlier in the day asked Hare to put the handgun away and he did so. Ortiz testified that a woman named Laura had asked her to ask Hare to put the gun away (although Ortiz

10

refused to do this). The testimony at trial of Hare's intoxication is both competent and credible. The conviction for Using Weapons While Intoxicated was not against the weight of the evidence.

{¶28} Hare's sole assignment of error is without merit.

{¶29} For the foregoing reasons, Hare's convictions for Felonious Assault and Using Weapons While Intoxicated are affirmed. Costs to be taxed against the appellant.


JOHN J. EKLUND, P.J.,

EUGENE A. LUCCI, J.,

concur.